Good morning, Your Honors. Good morning. I would like to reserve five minutes of my allotted time for rebuttal, please. I don't know if we'll adjust the clock or if I'll just keep that in mind. All right. Yeah, you have 15 minutes total, so we'll try to keep an eye on the clock. Okay. May it please the Court, my name is Kyle Edgerton. I represent the petitioner, Christian Alexis Lopez-Lopez. It's a pleasure to join you here from Reno, Nevada, where I come from and where Christian's mother and siblings all reside. His mother is pending permanent resident status, and his four siblings either U.S. citizens or have lawful permanent resident status. Christian's not here today because since January of 2021, he has been in immigration detention, fighting against this case and fighting for an opportunity to remain in the country that he has called home since he was about two years old. Well, I think we realize all of those facts, and he did have status, which he allowed to lapse, and then he had what I might say a crime spree and went to prison, and now here we are. So we're looking at whether we've got CIMTs and also the Pardon Waiver Clause. That's correct, Your Honor, and that's a helpful summary. I'll jump into some of the issues that you just raised, Judge Callahan. The sole basis for Christian's removal is a charge under Section 237A2A, Romanat II, for having multiple convictions that constitute a crime involving moral turpitude. And as the Court is aware, we brought three different arguments that those proceedings should be terminated because that sole charge is defective. And I'll just hit them briefly. Again, the Court is aware of what those are. The first is this issue of the Pardon Waiver Clause. That's 237A2A, Romanat VI. And the essential issue there is that these municipal offenses under Reno Municipal Code, of which Christian was convicted, are what I call nonpardonable offenses. And what is your basis for that? Thank you, Judge Sanchez. We didn't – there was not – the record does not indicate definitively that those offenses are not pardonable. There was not a pardon application made to the city attorney's office. More than definitively, I don't really get a track – I'm not tracking your argument because I don't know whether or not the governor has a pardon authority over these offenses. Right. What would you point to? What sort of authority, state authority, would you point to one way or the other to elucidate that matter for us? Certainly. And so just within the structure of Nevada law, as is often the case, municipal power is delegated, devolved down from the state authority. And in our briefs and in the arguments before the board and in the motion before the immigration judge to terminate, there was an extensive discussion, at least on our part, of the statutory structure in Nevada law, which devolves the power to municipalities to set territorial boundaries, to manage zoning, things like that, even to create criminal offenses. But there is no devolution of power to be able to pardon offenses. There's nothing in the Reno City Charter that creates that power. The relevant statutes are completely silent on the matter. I can see that no effort was made to pursue that. And for that reason, it may be necessary simply to remand this to pursue and determine that factual question. But at the same time, there's nothing, there's no hint anywhere in state law principles more broadly or in the Reno City Charter that would indicate that there is a power of the mayor to municipalities. We may not need to get there if we resolve the CIMT issue in your favor, but it just struck me that there was a lot of ink being spilled on this issue about the pardon waiver when the threshold question was, well, why haven't you brought forward some indication that the Reno convictions can't be pardoned? Right. Just as a beginning starting point. Right. Yes, conceded. Okay. It's just that, again, it's a matter that we just did not pursue. And our hope is that either on this, reading the statutory scheme and determining that this court's holding in Goebbels, affirmed in Costello, cited favorably by the board for a period of time in Ceballos, matter of Ceballos, that there's no need to get into what the facts would look like there. And then additionally, there's these additional arguments that maybe the CIMT matter falls aside. So let's get into the CIMT. It seems as if your strongest argument is the municipal code provision about intent to deprive doesn't seem to shed light one way or the other on whether that's an intent to permanently deprive or not or whether it tracks state law. And what should we do with that? There's a state code reference, which may be persuasive or not. How should we resolve this issue? Well, general categorical approach principles apply. And so, again, to put it simply, when there is ambiguity, we resolve that through a principle of lenity in favor of the respondent, in favor of the person who's facing banishment from the United States. And this is a principle that we can find in all kinds of circumstances. A noncitizen is charged with a controlled substance offense. And it's maybe a bit squishy or unknown what that controlled substance was. If we can't determine through the categorical or modified categorical approach that that was cocaine or heroin or methamphetamine, we essentially have to retreat to a presumption that it was a small amount of marijuana for personal possession. Okay. But here, given that the Reno Municipal Code instructs to construe its terms according to the context and approved usage of the language, isn't it appropriate to consider the definitions of deprive under Nevada law and the Model Penal Code? Can you cite to any cases discussing interpretation of municipal law in this context? I can't cite to any relevant cases, Your Honor, at this time. How I would respond to that, Judge Callahan, is, again, there's two pieces. One is that the Reno Municipal Code says it is to be determined based on context. And so we advanced an argument that that essentially means common usage, dictionary definitions, et cetera, and that that would tend not to reach the intent to deprive standard. Separately, it would be very natural for the Reno Municipal Code to say these provisions are to be interpreted consistent with Nevada statutory law and decisional law. That would be a very natural and obvious thing to do. In the Reno Municipal Code, the charter did not do so. It doesn't seem natural to me to interpret the petty theft statute to cover more than just the permanent or substantial deprivation of property. Well, we argued, Your Honor, that there is a reason. Because in the municipal context, we are dealing with, by definition, urban areas. You're dealing with kind of higher propensity crime, more social harm from criminal offenses of various natures. And so it would make sense for a municipal body to create a criminal statute that actually sweeps more broadly. But you're just borrowing stuff or what? I'm sorry? You're borrowing stuff you're not permanently depriving? Certainly. It just doesn't make sense to me. Nevada law in the same chapter, 205, I don't believe this is in the briefs, but I just know it personally. Nevada law has both a possession of a stolen motor vehicle, grand theft auto type statute. It also has taking a vehicle without intent to deprive, basically a joyriding statute. And so legislative bodies may distinguish different kinds of conduct and may punish joyriding or its equivalent in the personal property context from something where there's an intent to permanently deprive. I just don't know of any theft crime other than when you're talking about vehicles. I don't know of any where that it's just borrowing or it's not permanently to deprive. We could speculate as to whether a municipal body would seek to punish that. The fact that the hypothetical, the situation that we advanced, again, before the immigration judge, and this is maybe a colorful example, was basically taking someone's unusual clothing for a costume party, taking my dad's paisley pantsuit from the 70s and going to a costume party without asking him. I've taken his property, but I did not have intent to deprive permanently. Now, whether a municipal body would go out of its way to sweep in that kind of conduct is a different question, but that would be the reason, would be to deter antisocial conduct. I don't know. That hypothetical sort of takes me to the theater of the absurd, so I'm trying to think more in terms of what really could happen. And the difficult thing, Your Honor, I think for the government or rather what bolsters our case is that with the categorical approach, which is the issue that we're at here, we do approach it with a light touch or rather with, again, from a principle of lenity. If there is ambiguity, if we are raising these questions and we can't quite resolve them and it's really a push or a jump ball, we resolve them in favor of the respondent. That is the principle of Taylor, and that's what brought us forward today. Even before we get to the rule of net lenity, doesn't Moncrief give us some guidance? Are we allowed as a court to sort of fill in a gap as to what the Reno Municipal Code would say or interpret or rely on the Model Penal Code or anything else for that matter if there's just nothing in the record or no state court decision to tell us one way or the other? Your Honor, I would argue that, no, the court can't fill that in. And, again, it's that if there is ambiguity, we retreat back and determine that the— because, again, in order to establish removability, it is the government's burden to establish that this person is removable by clear and convincing evidence. And so if there's not—excuse me, that's a misstatement. But there is a—the government's burden to establish this person is removable. And if the government can't proffer a conviction that will meet the requirement for removability and we're not able to determine that it does, in fact, meet that standard, then the government fails and the respondent must be relieved from the threat of removal. So the government could come forward with some evidence that Reno only ever prosecutes people for permanent deprivations of property and not temporary ones? I think if they could come forward with an adequate factual predicate to support that, then that would put us certainly on our back foot. So you're getting into your rebuttal time. I am. Do you want to reserve? I will reserve, thank you, unless the court has any other questions present at the moment. Thank you. We'll hear from the government. Good morning, Your Honors. I'm Spencer Shuchard for the United States, and may it please the court. Good morning. This is actually a straightforward case because it's about reality versus fantasy. Almost everything the petitioner is asking you to do is foreclosed by law. The petitioner has sort of proposed this alternate reality in which the case law is more to his taste, but in order to accomplish that, Your Honors, we'd have to overturn at least two board precedents, at least one of your own precedents, probably more, and ignore at least one and probably several Supreme Court precedents. Mr. Shuchard, are you referring to how to interpret the Reno Municipal Code? Do you have authority to tell us how we should interpret this statute, this language in the Municipal Code? The board's interpretation is due deference because they're interpreting a statute here, and under the categorical approach, the board's interpretation of the elements of codes is due Chevron deference.  I'm sorry to clarify that, but I thought the board is owed Chevron deference as to its determination whether a conviction is a crime involving moral turpitude, but when it comes to looking at state law, we review that de novo. I will put, Your Honor, to Gallardo v. Bard, which is 968 F. 3rd, 1053. That gives a sort of in-depth analysis of how Chevron and the categorical approach arrive at the elemental part of determining which elements match federal generic. In this case, the Reno Municipal Code commands its users to construe its terms according to approved content. It criminalizes petty larceny, it gives those terms, and then it gives the context. It points to the Nevada State Code for petty larceny. That's a straight line of interpretation. There's really not that. There's honestly no gap to fill there, and that's a reasonable interpretation. The court is due deference on that. Again, I'm talking about reality versus fantasy in this world. Before we get into any pejoratives, what about Reno Municipal Code 1.01.060, which says state law references are not intended to have any legal effect but are merely intended to assist the user of the code? What do we make of that? Because there's that state code reference, and then in another part of the municipal code, it says there's no legal effect to it. What I believe it's disclaiming there is just recognizing the reality that Reno City Council can't promulgate state law, and Reno City Courts can't prosecute state offenses. They can only prosecute court-ordered offenses. But it is telling you that these cross-references exist. They're there on purpose, and they're there to assist the user, i.e., to provide context. So when they give us these cross-references, the context is there. They've already told us to take that context and apply it to assist in understanding what they mean, and they've given us the matching state petty larceny charge, which is a categorical CIMT. That was the board's categorical analysis here. So in your interpretation, that state code reference means that the municipal code is following state law? Yes, exactly. But the definition of petty larceny under state law in Nevada is different from the definition under the Reno Municipal Code. They're substantially similar. If you look at them carefully, no, they're not. Which part of them do you feel is different enough to make this an uncertain match? Well, the state statute doesn't specify the intent element. The intent element is defined in another part of the state statute, that's true. But the state petty larceny statute has had its terms defined both within the statutory scheme and by case law. And I think we can give the drafters of the Reno Municipal Code credit for understanding that their terms will be given meaning by courts in their litigation. Well, it's kind of a stretch if you look at the structure of Nevada law, because they clearly give the municipalities the power to enact these ordinances. There is a provision that Judge Sanchez referenced. So, I mean, aren't we really just stuck with looking at the words of the ordinance unadorned by state statute? Not at all, because otherwise why would the state statute reference be in there? How would we give effect to that when the Reno Municipal Code is told us to? Are you conceding, then, that if you look at the municipal ordinance alone, that it doesn't satisfy the categorical approach? I mean, do we need to get – your argument is we need to get to the state interpretation, which implies to me that you're conceding that on its face the municipal ordinance does not satisfy the categorical approach. I'm not conceding. You should make an argument. I'm making the argument, Your Honor. Just focus on the ordinance, do you think, unadorned by reference to state law. If you strip out the context, yes, Your Honor, then there's not enough in there on its own to help us understand what the elements are. But that's true of a lot of statutes. Take Mathis, for example. Take burglary. Often we have to look at other parts of statutory schemes. But the difference with those cases is there are state court decisions that we can rely on in order to interpret how the state court enforces its own statutes, right? So that's where the importance of state court decisions come in. And as I understand it, there aren't any that have interpreted the Reno Municipal Code provision. No, you're not going to find any. And that's going to be true for most municipal ordinances. They don't typically get litigated in that way. So if that were the rule, that under municipal codes that don't give us specific, you know, by the word, this is what we mean by every term, then there's going to be a lot of city code violators that don't end up getting the IMT charges that they deserve. But I think I do want to point your honors to Nevada Revised Statute 268.018 in which the state tells us that municipalities can only charge people with misdemeanors under the municipal code if there is a matching or if the matching state crime is also a misdemeanor. And again, petitioner was charged with misdemeanors. You can see that several times. So I think that's another strong sort of circumstantial evidence that this is what was meant by the by the city of Reno when they criminalized petty larceny. Otherwise, what we're looking at is petty larceny is a crime in all of Nevada except Reno. There's no reason why by the city of Reno would have swept more broadly. There's no reason why they put these words into their municipal code without intending us to give effect in some way. And when we interpret statutory schemes, be they municipal codes or state statutes, the board is charged. It has to look at every piece of the statutory scheme to understand what the words mean. It doesn't have to all be within that same little piece. It's telling us exactly where to look. So we have the definition of the crime. We know that Nevada state petty larceny is a CIMT. So we know that this is as well. Do you think it's based on the state code reference that Reno is precluded from trying to prosecute someone for just a temporary deprivation of property under this code provision? Under petty larceny, yes. So I guess you're ascribing some legal effect to the state law reference. Even the municipal code says you shouldn't do that. It's there for context. Otherwise, it's just there to fill space on the page. We have to try and understand why they gave us these cross-references. And that's easy enough to do because they told us in the code what cross-references mean, the context. That is how we construe the terms. So if any of these terms are ambiguous, the cross-references help them not be ambiguous. Could I ask you briefly about the pardon waiver issue? Are you aware, one way or the other, whether there's no pardon authority for the conviction for municipal offenses? No, I'm not aware. That was never litigated. The petitioner conceded that issue in court and so it wasn't put in there. He was quite right to concede it because his argument is foreclosed by a matter of no one. Would you like to explore the pardon waiver issue? Have we done with intent to deprive? I can move on. The petitioner conceded at trial that his pardon waiver issue was foreclosed by law, and he's quite right to do so because for over 30 years, the rule for pardon waivers has been that the first thing that courts do is to determine whether there's been a conviction and then, secondly, to see whether there's been a pardon. That's a perfectly reasonable construction of the statute. It tracks the language. The petitioner agrees that this is a logical reading. Since everyone seems to be in agreement that this is a reasonable interpretation, the court should defer a matter of no one. The cases that he cites, they've gobbled Costello. Both of those cases are mid-century cases interpreting a statute that's now been repealed. And they also both rely on the idea that Congress was silent about what a conviction was in the CIMT context. And that was true at the time, but Congress has since passed a definition of conviction at 1101A, 48A of the INA, and it doesn't include pardonability. The petitioner kind of gives away the game. In his reply brief, when he makes an analogy to Mathis, he's calling pardonability an element of the CIMT, the 1227 CIMT chart. But that's not what it is. The elements of CIMT have been settled for quite some time by this court, by the agency. It's reprehensible conduct committed with some level of criminal mens rea. There's not a pardonability element in there. So no matter how you look at this, whether Chevron's there or not, the petitioner failed on that issue. The same is true for his single scheme argument. The petitioner again conceded this at trial because he felt that Zogny and Adetiba, the matter of Adetiba, blocked his argument, and he's right again, committing several acts of larceny over a period of a couple weeks, because you're in a poor frame of mind is not a single scheme of criminal misconduct. So again, in this world, he loses, and his alternate reality doesn't work either. So to give him the opportunity, he gives himself a clean slate to rewrite the law, and he just rewrites Zogny. He sort of advances this idea of a pause and reflect paradigm, but that's already in Zogny. They call it reflect and dissociate. He talked about what he called the wood approach, which is a fact-specific argument, but a single scheme is already a fact-based issue that the court reviews for substantial evidence that's in Zogny. So again, this issue doesn't work for him. And so again, on all three points of removability, the petitioner's argument failed. And as to the merits of this case, I'm going to start by talking about his – I think I'll start by talking about Nexus. Unless your honors have a question about the untimely application, the asylum issue? No, we don't appear to. Okay. So then I just want to hit a couple things about the substantial evidence standard for Nexus. I just want to point out the petitioner has conceded that the board applied the proper legal standard here. There's no question about mixed questions of review or anything like that. We're just talking about the motive finding. And in this case, the evidence is that the persecutor was – he had violence. It was directed at everyone in the house. It was targeted indiscriminately. It was triggered by nothing. The gentleman was often drunk. Everyone in the house was related to the petitioner's mother. So there's no way to distinguish whether or not this was targeted by animosity toward one or all of them or just that he was an often drunk and angry person. The IJ's determination about the persecutor's motive there cannot – the evidence can't compel that a different outcome should follow there. And I think, unless Your Honor has any other questions, I'll be prepared to rest on the brief. We have no additional questions. Thank you.  Thank you, Your Honor. Your Honor, if I could just pick up on a couple of my friend's points. I think that Judge Callahan properly pushed back on a poor analogy of mine with regard to the suit example for sweeping and additional conduct. But again, I would remind the Court that when we look at Diaz-Lizarraga and the Ninth Circuit, I think it's Barbosa-Garcia case, adopting that, this is the distinction between the intent to deprive and not. There was a need to do that, right? There was a need to distinguish statutes that include the intent to deprive component from those that don't. And so that is sufficient for this purpose of this analysis. We don't have to theorize what the purpose would have been for the Reno Municipal Code. The fact is, again, under the categorical approach, we're looking, as Judge Thomas indicated, for the language of that provision. And if we don't see the elements or the indicia that we need, we need to determine that that provision is not adequate for a conviction that would constitute a categorical crime involving moral turpitude. Again, briefly on the Reno Municipal Code component, I wanted to draw the Court's attention to a brief exchange the parties had with regard to a Citizens for Cold Springs case that my friend brought to my attention. I was a bit perplexed by that because, as I understand, part of the government's reading is that Nevada statutory law basically bars municipalities from having redundant provisions. That seems to be at least one reading of that Citizens of Cold Springs case. If that is the case, if municipalities are not allowed to have redundant provisions with state law, then that really draws us into the question of whether Reno Municipal Code 810.040 can be duplicative of Nevada Revised Statute 205.240. If it is the case that municipalities basically can't copy the state legislature's homework, that does lead us more firmly in the direction of concluding that there's something distinct in Reno Municipal Code versus state law. And as I indicated, I may not be the best at analogies. I've been struggling to understand the government's complete perplexedness at this argument that once the judicial recommendation against deportation was repealed in 1990, the JRAD, as I'll call it, that my friend seems to think that the entire regime of Goebbels, Costello, Ceballos must fall aside. I don't know if Ceballos was overruled internally by the agency. Well, I guess that on the pardon waiver clause, we found in Goebbels that the statute's framework supported an interpretation that unavailability of judicial recommendations against deportation meant the crime, quote, unquote, was not one which could support deportation. Why isn't that rationale equally applicable here? And how do we weigh prior judicial interpretations against the BIA's interpretation in the matter of Nolan? Can the BIA's interpretation overcome a contrary judicial interpretation? That takes us into Chevron and Brand X territory that we probably don't have enough time to unpack. It does. It does. We're not asking to unilaterally rewrite Ninth Circuit law. We're simply noting that within six weeks, there's a decent chance that the Supreme Court, the U.S. Supreme Court, will have done something to Chevron. Maybe it'll have been pared back. Maybe it'll have been completely overturned. Well, people have been talking about that forever. So I guess I'm not sitting on the edge of my chair. I'm not taking any bets. My law clerks have been talking about this for the whole 20 years I've been on the court. And I would be wise not to hold my breath. I'm simply pointing out to forecast what those issues would have and what implications it would have for this case. With regard to Goobles, again, my friend seems to be indicating that because a component, and again, the analogy between Goobles and the former 241A4B2 structure to now is a bit twisted and complicated. But Costello and Goobles or Gobbles or however we say it, they recognized the statute was ambiguous. So if the statute's ambiguous, then the way things are presently, the BIA's interpretation can be given deference. Well, it's tricky because ambiguous took a very different meaning after 1984 with Chevron. So when in 1958 a court described something as ambiguous, it does not freight it with the meaning of that word 30 years later. But I guess, you know, maybe you're just super special because no one's been talking about this for 40 years. So now you're talking about it. Well, Your Honor, part of that, part of the reason, if I may continue, I'm over time. Just briefly, yes. The main reason why, whether it's we think that we're special, it is that no one has touched this matter. Because, again, this comes up in edge cases. That's just one piece briefly, and again, we touched on it in the briefs. This comes up in unusual circumstances, such as this one. So that is one piece of why it doesn't get brought up. Another piece is, again, I think many practitioners, probably like my friend, look at this and say, okay, here's a 60-year-old decision that looks like dead letter. Also, it was overturned. It was internally overruled in 1988 in Nolan. End of story. But, again, Chevron is one piece of it. We'll set that aside. The analysis in Nolan, as we go into, to some extent, in our briefs, is quite flawed. I really wish I could have unpacked for you some of the policy implications of this. If I may briefly state them. I think we're okay. Okay. Unless either of my colleagues have questions. I think we're fine. Okay. We're fine with that one. All right. So this matter will stand submitted. Thank you both for your argument. This Court is in recess for the week. Thank you. All rise.
judges: THOMAS, CALLAHAN, SANCHEZ